IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 20, 2021

## LARRY THOMAS COCHRAN v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Sevier County
Nos. 15358-II, 14956-II, 14906-II       James L. Gass, Judge**

_____

### No. E2020-00316-CCA-R3-PC
_____

The Petitioner, Larry Thomas Cochran, appeals from the Sevier County Circuit Court's denial of his petition for post-conviction relief from his 2010 convictions for attempted first degree murder, aggravated assault, two counts of attempted aggravated robbery, resisting arrest, and criminal impersonation, for which he is serving an eighteen-year sentence. On appeal, the Petitioner contends that the post-conviction court erred by finding that his petition for relief was untimely and by denying relief on his allegations of ineffective assistance of counsel and due process violations. Although we conclude that the post-conviction court erred by determining that the petition for relief was untimely, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Gregory E. Bennett (on appeal and at post-conviction hearing), Seymour, Tennessee, and James R. Hickman (at post-conviction hearing), Sevierville, Tennessee, for the Appellant, Larry Thomas Cochran.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Jimmy B. Dunn, District Attorney General; and Ronald C. Newcomb, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Petitioner's convictions relate to a November 16, 2009 robbery at the Greystone Lodge in Gatlinburg, Tennessee. The Petitioner and codefendant Jack Price were tried jointly. The facts of the case were summarized by this court in the Petitioner's previous appeal:

On November 16, 2009, Winston Cartwright and Kevin Brown were staying in a motel room at the Greystone Lodge. On that date, Mr. Brown's five-year-old nephew was also there visiting. Defendant Price called Mr. Brown that evening and asked if he could come over to the motel room and play with Mr. Brown's new X-box gaming system. Mr. Brown testified that, about six months prior, he had told Defendant Price that he had purchased a "brand new X-Box 360, Batman edition." Mr. Brown also said that the gaming system cost him "over four hundred bucks[.]"

Mr. Cartwright, on the evening of November 16, left to go visit his mother at a nearby motel. On his return walk back to the Greystone Lodge, he saw a gold Buick pull into the motel's parking lot. It was dark outside at the time. According to Mr. Cartwright, when he got about halfway up the stairwell to his room, someone put a gun to the back of his head and threatened, "if you move, if you say anything, I'll kill you." Cartwright said that he recognized the voice as belonging to Defendant Price. Cartwright was forced up the stairs to the room, where he knocked on the door. Once inside the room, Defendant Price pushed Mr. Cartwright to the floor.

As he entered, Defendant Price said, "[G]ive me everything you've got[,]" and he then went directly to Mr. Brown and hit him in the head with the 9mm pistol. Mr. Brown grabbed a knife off the table and said, "[D]o you want to f--king f--k." As Mr. Brown stood up to swing at Defendant Price, Defendant Price pointed the weapon at Mr. Brown's face and pulled the trigger. However, rather than firing, the clip fell out of the weapon. Defendant Price then "threw his hands up" in the air, and Mr. Brown proceeded to swing at Defendant Price with the knife.

Mr. Brown testified that he also saw Defendant Cochran, who was Defendant Price's cousin and also known to him as "Ghost," inside the motel room. According to Mr. Brown,[1] Defendant Cochran was behind Defendant Price and was pointing his gun at Mr. Cartwright on the floor. After the clip fell out, Defendant Price proceeded to back out the door, and Defendant Cochran was "right behind him." Mr. Brown saw Defendant Cochran point the gun at him as he was leaving the room, "like he was going to fire[.]"[2] Mr.

---

[1] Mr. Brown testified that there were a total of three men who came to the motel room to rob him. He was never able to identify the third individual.

[2] Mr. Cartwright was cross-examined extensively about whether he saw or only heard the events taking place in the motel room and about whether his identification of the Defendants were based upon sight or sound.

Cartwright said that he heard Defendant Cochran saying "go, go, go, go." Mr. Brown slammed the door shut with his foot and dropped to the floor. Mr. Brown then went to check on his nephew. After a couple of seconds had passed, Mr. Brown went outside and saw "a gold Buick driving off in a hurry with a guy that ran and jumped in the window head first and his legs were hanging out the window." According to the victims, the whole incident happened very fast.

After the robbers left, they called the police. According to Mr. Brown, he then received a text message from Defendant Price asking "why [he had] got the police into it[.]" Mr. Brown responded by text message "because you tried robbing my house, that's why." Officer Matt Smith of the Gatlinburg Police Department arrived on the scene where he spoke with Mr. Cartwright and Mr. Brown. Officer Smith described the two men as "[v]ery erratic, scared, excited, just a variation of emotions."

Mr. Cartwright and Mr. Brown thereafter gave several statements to the police. Mr. Brown was shown some photo arrays, and he was able to identify Defendant Price therefrom but not Defendant Cochran. Mr. Brown elaborated at trial that Defendant Price had tattooed on his hands "Family First" in italics. According to Mr. Brown, he saw this tattoo when Defendant Price pulled the trigger. Also at trial, Mr. Brown identified the weapons used by each Defendant during the robbery, a 9mm by Defendant Price and .25 caliber handgun by Defendant Cochran, and the Lorcin 9mm clip, which contained six bullets, left inside the motel room. Mr. Cartwright was able to identify the 9mm held by Defendant Price and the clip that fell out the pistol. Both victims were able to identify a photo of the gold Buick, which showed a Delaware license plate, as the same one they saw at the motel that day. Mr. Cartwright opined at trial that this was "all over" the "X-box and tattoo equipment."

The following day, Officer Todd Myers and Detective Keith Brackins of the Gatlinburg Police Department went to a residence on Ellis Ogle Road to serve a warrant on Defendant Price; Officer Shane Carl Bowen, also employed by the Gatlinburg Police Department, was assisting in serving the warrant. When Officer Bowen arrived at the house, he "heard a loud thud and gave chase to a subject." The subject fled into the woods. After a K-9 unit arrived, the dog tracked the subject's scent through the woods and located Defendant Cochran. A struggle ensued, and Defendant Cochran was arrested.

When asked to identify himself, Defendant Cochran initially provided an incorrect name and social security number, giving his phone number as his social security number. Officer Bowen testified that others had given phone numbers as social security numbers and that such practice was always out of deceit. Defendant Cochran was initially taken to the Gatlinburg Police Department and then on to the hospital to receive treatment for his injuries from running through the woods.

While at that residence, Officer Myers impounded a 1997 Buick, which matched the description given by Mr. Cartwright and Mr. Brown. Defendant Price was not at the residence when the officers attempted to serve the warrant on him, but he later turned himself in.

Terry Pack lived at the Ellis Ogle Road residence and testified that Defendant Price began living with him after getting "kicked out of his other house[.]" According to Mr. Pack, his parents were out of town at the time of the incident. Mr. Pack said that Defendant Price drove a Buick and identified the previously introduced photograph of the Buick with Delaware plates. Mr. Pack also testified that Defendant Price was from Delaware.

Mr. Pack only knew Defendant Cochran through Defendant Price. According to Mr. Pack, Defendant Cochran was in town from Delaware trying to get his brother, also Defendant Price's cousin, out of jail, but the Defendants were unable to obtain the money to do so. Prior to the day of the attempted robbery, Defendant Price had asked Mr. Pack if they had any guns in the house, but Mr. Pack told him that they did not. Mr. Pack became suspicious when Defendant Price asked about the guns and had also asked for money, so Mr. Pack told Defendant Price that if "he was going to do something they had to leave."

On November 16, Defendant Price left Mr. Pack's house in a maroon four-door sedan with someone who went by the name of "Tay." When Defendant Price returned alone later that evening, "he was real nervous and he seemed really upset, like he was really angry and he was sweating a lot." When Mr. Pack inquired as to the cause, Defendant Price relayed details about the robbery to him. Defendant Price told Mr. Pack that they went to the Greystone Lodge that night and met Gage Nero, asking him for "any weed." They walked up to the room to retrieve the drugs, and Defendant Price "put Gage on the floor and told him not to move." According to Defendant Price, there were several other people in the room when they entered, including a girl and an infant. Defendant Price said that, after entering the motel room, he "looked around" and "put" the 9mm to Mr.

-4-

Brown's head, who grabbed a knife and started swinging. Defendant Price said that, when he pulled the trigger in response, nothing happened and that the clip fell out, so they ran out. After telling Mr. Pack this story, Defendant Price stayed at Mr. Pack's house that night; when Mr. Pack awoke the next day, Defendant Price was gone. Later during Mr. Pack's trial testimony, he testified that Defendant Price placed Defendant Cochran inside the victims' motel room and stated that Defendant Cochran participated in the attempted robbery by "reaching for stuff on the table." Mr. Pack speculated that Defendant Cochran was reaching for drugs.

Mr. Pack also described the officers' arrival at his house on November 17 to serve the warrant on Defendant Price. According to Mr. Pack, Det. Brackins knocked on the door and asked if Defendant Price was there. Mr. Pack let Det. Brackins inside to look, and then he heard someone jump out of his parents' bedroom window. Following these events, Mr. Pack was taken to the station for an interview. When he returned home, accompanied by the police, the front door was "wide open" and Defendant Price's clothes were on the couch. Mr. Pack's parents' bedroom door was open, and he and the officer saw the 9 mm in the lockbox in the room. There was not a clip with the gun. He did not remember seeing any other weapons in the house that day. He identified the 9mm weapon introduced at trial and stated that it belonged to his father; he also testified that the clip introduced at trial was the one "that goes in the nine millimeter." He further identified the .25 caliber pistol as belonging to his mother.

Captain Jeff Fisher of the Gatlinburg Police Department testified that he went to the residence on Ellis Ogle Road on November 17, where Mr. Pack lived, to "check to see if a weapon was there that was possibly involved in the case." Mr. Pack showed Captain Fisher three weapons, including a 9mm semi-automatic and a .25 caliber pistol. Captain Fisher took only the 9mm at that time to see if the victims could possibly identify it and left the other two guns at the house. Captain Fisher testified that the gun confiscated was the only Lorcin 9mm he had ever seen. The .25 caliber weapon introduced at trial appeared to be, in Captain Fisher's opinion, the same weapon he saw but did not take from Mr. Pack's house that day.

Detective Rodney Burns of the Gatlinburg Police Department showed the 9mm taken from Mr. Pack's residence to the victims, who identified it as the one used in the robbery. Det. Burns interviewed Defendant Price after he turned himself in, and Defendant Price told Det. Burns that "he acted alone in it" and "that the gun he used he had hid on the river bank." In April of the following year, a confidential informant told Det. Burns "that Ashley Davis

had that gun that was used in the home invasion and robbery that occurred at the Greystone." After searching Ashley Davis's bedroom, Det. Burns found a .25 caliber semi-automatic pistol, and there was a clip with live rounds in the recovered gun.

Ashley Davis testified that she was Defendant Price's ex-girlfriend and that Defendant Price gave her a gun and told her to hold on to it because he was turning himself in. Ms. Davis said that Defendant Price told her that "[h]e pulled the trigger and the clip fell out." Ms. Davis testified that she hid the gun down by the river but then returned to retrieve it when she heard that people knew where it was. She later kept the gun in her bedroom, where it was found by Det. Burns.

No identifiable prints were found on either of the pistols or the clip in the motel room. Both Defendants declined to testify and did not put on any additional proof.

*State v. Jack Price and Larry Thomas Cochran*, No. E2011-01050-CCA-R3-CD, 2013 WL 5371679, at *1-4 (Tenn. Crim. App. Sept. 26, 2013), *perm. app. denied* (Tenn. March 11, 2014). Although this court affirmed the Petitioner's and his codefendant's convictions, it remanded the case to the trial court for a new sentencing hearing because the trial court "utilized an unauthorized sentencing procedure." *Id*. at *1. Although the amended judgments of conviction are not included in the appellate record, the petition for relief stated that upon remand, the Petitioner received an eighteen-year sentence. The Petitioner did not appeal the sentence.

On March 26, 2018, the Petitioner filed a pro se petition for post-conviction relief, alleging, in relevant part, that he received the ineffective assistance of counsel and that his due process rights were violated.

At the post-conviction hearing, the Petitioner testified that trial counsel was appointed after the preliminary hearing and that he told counsel he was not present during the offenses. The Petitioner said he told counsel that he was alone at Terry Pack's house when the offenses occurred. The Petitioner said that counsel had "transcript[s]" of Mr. Pack's and the codefendant's stating Gage Nero was in the motel room. The Petitioner said that he asked counsel to interview Mr. Nero and Catherine Nelson but that counsel admitted to the Petitioner that they were not interviewed. The Petitioner recalled that counsel said, "Well, if you don't have anybody that can say that you [were] with them, then it's not considered an alibi."

The Petitioner testified that at a pretrial court appearance, the prosecutor told the trial court that the Petitioner and the codefendant would be tried jointly. The Petitioner said he told the trial judge that the Petitioner "never agreed to that" and that he wanted the cases severed. The Petitioner said trial counsel was not present in the courtroom during this exchange and that the judge said he "wouldn't do anything to harm" the Petitioner without counsel being present. The Petitioner said he repeatedly told counsel he wanted a separate trial because "other certain people would be able to testify against [the codefendant's] out-of-court statements" if they were tried jointly.

The Petitioner testified that the .25-caliber handgun was found after the preliminary hearing, that a confidential informant told the police about the gun's location, and that the gun was found at Ashley Davis's home. The Petitioner said that Ms. Davis told the police she kept the gun at the codefendant's instruction but that this evidence was not presented at the trial. The Petitioner said that before the trial, there was no evidence showing the .25-caliber handgun was used during the incident. The Petitioner said Kevin Brown "identified in writing" that the 9-millimeter handgun was used by the codefendant during the shooting. The Petitioner said that he asked trial counsel to file a motion to suppress the .25-caliber handgun because it prejudiced his defense that he was not present during the shooting.

The Petitioner testified that he wanted a firearm expert to examine the 9-millimeter handgun and to testify at the trial about how the firearm operated and whether it would fire. The Petitioner said that he asked trial counsel to investigate the criminal histories of the victims for impeachment purposes, that counsel said the investigation did not reveal any criminal history, and that the Petitioner learned from the discovery materials that Mr. Brown had a 2008 theft conviction. The Petitioner said he "left [the issue] alone" because counsel was his attorney. The Petitioner said the theft conviction was not addressed at the trial. The Petitioner said that Mr. Brown testified at the trial that Mr. Brown had seen the Petitioner during the robbery but that Mr. Brown was unable to identify the Petitioner from a photograph lineup. The Petitioner said he wanted counsel to suppress the lineup and to argue Mr. Brown should not have been allowed to testify about the identity of the perpetrators. The Petitioner said, though, that counsel questioned Mr. Brown about Mr. Brown's inability to identify the Petitioner from the lineup.

The Petitioner testified that he invoked his right to counsel when the police attempted to interview him, that the police stopped questioning him and photographed him, and that he thought an attorney should have been present when the photograph lineup was presented to the witnesses. The Petitioner stated that he was the only person in the lineup who was not wearing a shirt and who did not have "the booking picture thing in front." He said Winston Cartwright identified him in this lineup. The Petitioner said that Mr. Cartwright committed perjury when Mr. Cartwright testified at the preliminary hearing that Mr. Cartwright saw but did not hear the Petitioner during the incident but said the inverse

at the trial. The Petitioner said that if the lineup had been suppressed, only Mr. Cartwright's inconsistent testimony would have been before the jury.

The Petitioner testified that although the trial evidence showed the Petitioner traveled from Delaware to Tennessee to assist in obtaining his brother's release from jail, his brother had already been released when he arrived in Tennessee. The Petitioner said that any reference to his brother's confinement should have been excluded and that trial counsel did not object to the inadmissible hearsay evidence. The Petitioner said that his brother and the codefendant, who was the Petitioner's cousin, "came and got" the Petitioner and that the Petitioner considered the evidence at the trial to be prosecutorial misconduct. The Petitioner said that during closing argument, the prosecutor identified him by his tattoos but that he did not have any tattoos before his confinement in this case. The Petitioner said his booking photographs, in which he was shirtless, confirmed the lack of tattoos. The Petitioner said, though, that while he was in jail awaiting trial, he had "graffiti letters" tattooed on his elbows, that these were his first tattoos, and that they were visible during the trial. He said that the prosecutor's mentioning tattoos was the first time anyone had said anything about tattoos and that the comments were not based upon the trial evidence.

The Petitioner testified that the evading arrest and criminal impersonation charges should have been severed because at the time of his arrest, he did not have an outstanding arrest warrant for the attempted murder change. He recalled that the prosecutor stated during closing argument that an innocent person did not run from the police and that this was the prosecutor's personal "view" of him. He said he ran because he did not tell his probation officer that he left Delaware to travel to Tennessee and that he knew he had violated his probation.

The Petitioner testified that he and trial counsel never discussed the issues to be raised in the appeal. When asked by the post-conviction court if he and counsel discussed the allegations of trial errors before the motion for a new trial was filed, the Petitioner said he asked counsel why counsel was not objecting during the trial. After post-conviction counsel showed the Petitioner the second amended motion for new trial, the Petitioner said counsel only stated he would file the motion within thirty days.

On cross-examination, the Petitioner testified that although he was identified at the trial by Mr. Brown and Mr. Cartwright by the nickname "Ghost," the Petitioner's nickname was "L." The Petitioner agreed that they identified him as a perpetrator but said that he sat beside the codefendant during the trial and that their proximity at the defense table tainted the witnesses' identification of him at the trial. The Petitioner said that although trial counsel highlighted Mr. Cartwright's inconsistent statements, counsel did not seek to have Mr. Cartwright's testimony excluded. The Petitioner wanted counsel to request a mistrial based on the "perjured testimony." The Petitioner said that he would not have been indicted

without Mr. Cartwright's testimony. The Petitioner denied that Mr. Brown identified the Petitioner before the trial.

The Petitioner testified that a firearm expert was necessary to the defense to show that the firearms were operational at the time of the offenses and that that the jury should not have been allowed to speculate. The Petitioner said that the firearms were not test fired and that the testimony did not establish the firearms had "firing pin[s]." He agreed that Ms. Davis identified the .25-caliber handgun during the trial but said that the handgun was given to her in a bag, that she did not look inside, and that she did not know a handgun had been inside. Later, after reviewing the trial transcript, the Petitioner agreed that Ms. Davis testified that she took the handgun out of the bag and wrapped it in a military uniform. The Petitioner said, though, that Ms. Davis provided four different statements and that trial counsel did not impeach Ms. Davis with her inconsistent statements. The Petitioner agreed that two witnesses identified the Petitioner as one of the two people with a handgun during the incident and that the identification of the Petitioner was based upon sight and the sound of the Petitioner's voice. The Petitioner agreed that counsel attempted to impeach Mr. Brown and Mr. Cartwright about "a misidentification" but said counsel did not move to exclude Mr. Cartwright's testimony. The Petitioner maintained that without Mr. Cartwright's identification, probable cause would not have been established at the preliminary hearing. The Petitioner stated that if his trial had been severed, Ms. Davis would not have been able to testify about the codefendant's out-of-court statements.

Trial counsel testified that he was appointed to the Petitioner's case about six months before the trial. Counsel recalled that a superseding indictment was returned, which added the attempted first degree murder charge, but said that he did not know the reason for the superseding indictment. He said that he and the Petitioner reviewed the discovery materials and the preliminary hearing transcript and that the chosen defense was the Petitioner was not present during the offenses. Counsel knew the codefendant's theory was that "it was a drug deal gone bad" and said counsel "worked extensively" with the codefendant's attorney. Counsel agreed that the chosen defenses conflicted. He did not recall if the Petitioner requested a severance. Counsel said, though, that he did not think a severance would have been appropriate, that his "tactic at the time was two legal minds are better than one," and that he might have done things differently if given the choice again.

Trial counsel testified that he did not recall the Petitioner's providing the names of potential alibi witnesses. He said, though, he did not interview any potential alibi witness. Counsel believed he spoke to some of the State's witnesses and said a joint defense investigator interviewed or attempted to interview all of the witnesses. Counsel did not recall if he spoke to Terry Pack but recalled that Mr. Pack's testimony "differed" from the other witnesses because Mr. Pack did not witness the offenses. Counsel recalled that Mr. Pack testified about the codefendant's statements and about seeing the codefendant "coming and going."

Trial counsel denied that the Petitioner asked counsel to hire a firearm expert. Counsel recalled that the magazine clip of one of the handguns used during the incident fell out and did not discharge. The record reflects that the magazine clip was received as an exhibit at the trial. When asked if it would have been appropriate to determine why the firearm did not discharge, counsel said he "should have taken a look at that."

Trial counsel testified relative to the .25-caliber handgun that a confidential informant told the police that Ms. Davis had possession of the firearm. Counsel said that he did not file a motion to suppress the handgun. Likewise, counsel said that he did not file a motion to suppress evidence that the Petitioner's brother was incarcerated, that counsel and the Petitioner discussed this issue, and that counsel did not recall the substance of the discussion.

Trial counsel testified that he reviewed the photograph lineup containing the Petitioner's photograph. Counsel did not recall that the Petitioner was the only person who was not wearing a shirt, that the photograph was taken in a jail holding cell, and that the Petitioner did not have tattoos at the time the photograph was taken. Counsel did not recall that the Petitioner wore the same clothes during the two-day trial. Counsel said that "we" did not coordinate a change of clothes for the Petitioner. Counsel admitted that he did not think about the impact of the Petitioner's wearing the same clothes both days and said that he "probably should have" thought about it. Counsel knew the trial would last two days.

Trial counsel said the main trial strategy was to impeach the credibility of the witnesses. Counsel said that he anticipated the trial testimony would "differ markedly" from the preliminary hearing testimony and that he hoped to obtain reasonable doubt through cross-examination. Counsel said that his cross-examinations were sufficient to allow the jurors to determine the victims were not credible.

Trial counsel testified that if Mr. Brown had previous felony convictions, he would have used the convictions for impeachment purposes but that he did not recall if Mr. Brown had previous convictions. Counsel recalled that someone mentioned Gage Nero[3] during the trial but that he did not recall if it was Mr. Pack. Counsel said that assuming the codefendant had been truthful when speaking to Mr. Pack about who was present during the offenses, Mr. Nero would have been one of the perpetrators. Counsel said he did not interview Mr. Nero.

---

[3] At this juncture at the evidentiary hearing, the parties and the post-conviction court discussed whether the last name was Nero, Nuro, or Nurell. The prosecutor stated that the trial transcript reflected Nero. We use Nero for consistency.

On cross-examination, trial counsel testified that Mr. Nero was not available for the trial, that the defense investigator may have searched for Mr. Nero, and that nobody knew Mr. Nero's whereabouts. Counsel said that working with the codefendant's attorney allowed him access to the attorney's work product and a joint defense investigator. Counsel considered this a "significant tactical benefit." Counsel said that based upon the defense that the Petitioner was not present during the offenses, counsel did not need to have a firearm expert examine the handguns. Counsel said that Ms. Davis's testimony about the handgun she held for the codefendant did not implicate the Petitioner and that, as a result, counsel did not cross-examine her for fear counsel would open the door to evidence implicating the Petitioner.

Trial counsel testified that he cross-examined Mr. Cartwright about his inconsistent testimony with respect to whether he saw the Petitioner during the offense. Counsel recalled Mr. Cartwright testified at the trial that he had lied at the preliminary hearing when he said he had seen the Petitioner. Counsel said his "tactic" during Mr. Brown's cross-examination was to show that Mr. Brown did not identify the Petitioner from the photograph lineup the day after the offenses. Counsel said that there was nothing about the Petitioner's appearance in the photograph that would have prevented Mr. Brown from identifying the Petitioner if Mr. Brown "had a good view" of the Petitioner during the offenses. Counsel recalled Mr. Brown's admission at the trial that he did not identify the Petitioner in the lineup. Counsel said that he also highlighted Mr. Brown's equivocal testimony about whether the Petitioner had been present. Counsel said that he "spared no effort in familiarizing" himself with the preliminary hearing transcript, that he knew the testimony well, and that he thought he effectively cross-examined Mr. Cartwright and Mr. Brown based on their preliminary hearing testimony.

Trial counsel testified that whether the Petitioner wore clothes in the photograph used in the lineup was not raised during the trial. Counsel did not recall if the Petitioner stated the Petitioner was alone at Mr. Pack's home during the offenses.

Trial counsel did not recall any issues related to the court bailiffs' or court officers' positions in the courtroom during the trial. Counsel recalled that correction officers were near both defendants during the trial but said that he did not recall their positions being "conspicuous to the jury." Counsel said that when the jury left the courtroom, the officers would position themselves "kind of over them" but not when the jury was inside the courtroom. Counsel did not know if the Petitioner's wearing the same clothes during the two-day trial could have led the jurors to conclude that the Petitioner was incarcerated. Counsel said it was possible a juror might conclude the Petitioner only had one set of clothes to wear for the trial. Counsel said he probably wore the same jacket during the trial.

-11-

On redirect examination, trial counsel did not recall if the Petitioner had advised that Mr. Nero was incarcerated in the Petitioner's pod at the jail. Counsel said, though, that if this were true, locating Mr. Nero would have been easy. Counsel did not recall the Petitioner's raising concerns about the photograph lineup because the Petitioner did not have an attorney present when the photograph was taken. On further cross-examination, counsel agreed that regardless of whether he sought a severance, the same evidence would have been "available" at the Petitioner's trial.

On rebuttal, the Petitioner testified that one of his complaints about the photograph lineup was raised by his attorney at the preliminary hearing. The Petitioner said that his photograph reflected he was shirtless and the date and time the photograph was taken. The Petitioner said that, as a result, the photograph lineup was "unduly suggestive" and should have been suppressed. The Petitioner recalled his preliminary hearing attorney's raising this issue and said that her statements would be reflected in the transcript.

The post-conviction court determined that the petition for relief was untimely. The court found that on September 27, 2013, this court entered its opinion affirming the Petitioner's convictions but remanding the case to the trial court for a new sentencing hearing. The court found that the subsequent sentencing hearing occurred in 2017, less than one year before the post-conviction petition was filed on March 26, 2018. However, the court determined that the Petitioner failed to file a timely petition for relief because the "final judgment was rendered on these issues in September 2012 by the Court of Criminal Appeals" and because the petition "was filed more than one year from that date – or more than one year from the date the judgment became final." As result, the court found that the post-conviction petition was time-barred by the statute of limitations.

In any event, the post-conviction court addressed the merits of the Petitioner's allegations of ineffective assistance of counsel and due process violations. The court determined that the Petitioner's allegations of ineffective assistance of counsel were "not supported" by the evidence. The court credited trial counsel's testimony and determined that counsel's strategy was to convince the jury that the Petitioner was not present for the offenses. The court found that the Petitioner told counsel the Petitioner was not present and that no alibi witness could establish the Petitioner was elsewhere. The court found that counsel successfully showed the jury that one victim could not identify the Petitioner in a photograph lineup and that the victims were focused on the codefendant's pointing a firearm at the victims. The court found that although the Petitioner argued "witnesses should have been excluded from the trial," no legal basis existed in which counsel could have argued for their exclusion.

The post-conviction court reviewed the trial evidence, including the photograph lineup presented to the State's witnesses, and determined that the Petitioner did not have any distinguishing marks or tattoos that would have made the shirtless photograph

"constitutionally deficient." The court found that the witnesses' inability to identify the Petitioner in the lineup went to the weight of the evidence, not admissibility. The court found that trial counsel used the lineup and the witnesses' inability to identify the Petitioner from the lineup as impeachment evidence. The court found that the witnesses' inability to identify the Petitioner benefited the defense.

The post-conviction court credited trial counsel's strategy relative to his decision not to seek a severance from the codefendant. The court found that "no compelling reason" was presented showing that the trial court would have granted a severance. The court determined that the joint trial did not violate the Petitioner's constitutional rights, noting this issue was addressed in the appeal from the conviction proceedings.

The post-conviction court determined that the record did not contain evidence showing that the firearms used during the offenses were inoperable. The court found that the evidence showed that "one gun did not fire" and that the magazine clip "fell out" during the offenses. The court determined that even if trial counsel had consulted a firearm expert, the trial evidence showed that the Petitioner and the codefendant intended for the handgun to work and that "it [unknowingly] failed to work." The court determined that an inoperable handgun "would not eliminate an attempt to commit the crime." The post-conviction court determined that the Petitioner received the effective assistance of counsel.

The post-conviction court determined that no legal basis existed for trial counsel to have sought to exclude the .25-caliber handgun from evidence. The court determined that after a confidential informant told the police officer where the firearm was located, the officer "followed up" with Ms. Davis, who was alleged to have had possession of the firearm. The court found that Ms. Davis testified at the trial about the circumstances under which she came to possess the firearm and that, as a result, the information provided by the confidential informant was "transactional" and merely led to admissible evidence. The court determined that it was immaterial how the confidential informant came to learn of the firearm's location because Ms. Davis testified that she hid the firearm at the codefendant's instruction.

The post-conviction court determined that the Petitioner's allegations of due process violations were without merit. The court found that the record did not "suggest a claim" that the trial court bailiffs and deputies "hovered behind or over the [Petitioner] or between the [Petitioner] and the jury except the position of an officer between the [defense] table and the jury" when the jury left the courtroom. The court noted that when leaving the courtroom, the jury "went out" by the defense table. The court, likewise, found that the Petitioner's constitutional rights were not violated by his wearing the same "street clothes" each day of the two-day trial. The court found that the record did not reflect "any suggestion" that the Petitioner had been incarcerated during the trial. This appeal followed.

-13-

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2018). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2018). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

## I.      Timeliness of Petition for Relief

As a preliminary matter, we note that although the post-conviction court considered the merits of the allegations raised in the petition for relief, the court also determined that the petition was untimely. However, the record reflects, and the State concedes, that the petition was filed within the one-year statute of limitations.

Post-conviction relief is available within one year of the date of a judgment's becoming final. T.C.A. § 40-30-102(a) (2018). The Post-Conviction Procedure Act states, "Time is of the essence of the right to file a petition for post-conviction relief . . . , and the one-year limitations period is an element of the right to file such an action and is a condition upon its exercise." *Id*. However, when an appellate court remands a case for further proceedings, including a sentencing hearing, the limitations period does not begin until the conclusion of the subsequent proceedings. *See Joseph Shepard v. State*, Nos. E1999-01279-CCA-R3-PC and E1999-02266-CCA-R3-PC, 2000 WL 1742077, *1-2 (Tenn. Crim. App. Nov. 28, 2000) (concluding that when a new sentencing hearing is ordered on appeal, the judgment of conviction does not become final until the conclusion of sentencing hearing when no appeal is taken).

The record reflects that in the appeal from the conviction proceedings, this court affirmed the Petitioner's convictions but remanded the case to the trial court for a new sentencing hearing. This court's opinion was entered on September 26, 2013, and the supreme court denied the Petitioner's application for permission to appeal on March 11, 2014. The amended judgments of conviction and the transcript of the subsequent sentencing hearing are not included in the appellate record. However, at the post-conviction hearing, the parties agreed that the sentencing hearing occurred on July 3, 2017, and that the Petitioner did not appeal the sentence. The Petitioner's petition for post-conviction relief was filed on March 26, 2018, which was within one year of the amended judgments becoming final. As a result, the post-conviction court erred by determining that the petition for relief was untimely.

-14-

## II.        Ineffective Assistance of Counsel

The Petitioner contends that the post-conviction court erred by denying relief on his ineffective assistance of counsel allegations.  He argues that he is entitled to relief because counsel failed to file a motion to exclude Mr. Cartwright's testimony, failed to object to the admission of the photograph lineup, failed to file a motion for a severance, failed to request funds to hire a firearm expert, and failed to file a motion to exclude the .25-caliber handgun from evidence.

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim.  *Henley*, 960 S.W.2d at 580.  "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim."  *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).  To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690.  The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision."  *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008).  This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).  To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*

## A.        Mr. Cartwright's Testimony

The Petitioner argues that trial counsel failed to file a motion to exclude Mr. Cartwright's testimony on the basis that Mr. Cartwright admitted at the trial that he lied at the preliminary hearing about having seen the Petitioner during the offenses.  However, the State correctly observes in its brief that the Petitioner failed to cite to any legal authority supporting the exclusion of Mr. Cartwright's testimony, and the post-conviction court did not err by determining that no legal basis existed to exclude the testimony because Mr. Cartwright's previous testimony was admissible for impeachment purposes as a prior inconsistent statement pursuant to Tennessee Rule of Evidence 613(a).

The record reflects that the post-conviction court credited trial counsel's testimony. Counsel's chosen defense theory was that the Petitioner was not present during the incident. Counsel's defense strategy was to impeach the witnesses with their previous statements in an effort to discredit their trial testimony that the Petitioner was one of the perpetrators. Counsel testified that he cross-examined Mr. Cartwright about his inconsistent statements with respect to whether Mr. Cartwright saw the Petitioner during the incident or merely heard the perpetrator's voice. Mr. Cartwright admitted at the trial that he had lied during the preliminary hearing when he stated he had seen the Petitioner. Counsel said that he "spared no effort in familiarizing" himself with the preliminary hearing transcript and that he used the transcript to cross-examine the witnesses. As a result, counsel used Mr. Cartwright's preliminary hearing testimony to impeach Mr. Cartwright's credibility and to attempt to establish reasonable doubt with respect to the Petitioner's identity. The Petitioner admitted at the evidentiary hearing that counsel questioned Mr. Cartwright about his inconsistent statement and "a misidentification." Therefore, the post-conviction court did not err by determining that counsel did not provide ineffective assistance. The record supports the court's determinations, and the Petitioner is not entitled to relief this basis.

## B.     Photograph Lineup

The Petitioner argues that trial counsel failed to object to the admission of the photograph lineup. He asserts that he was the only person in the lineup who was not wearing a shirt and that, as a result, the lineup was "tainted" and should not have been presented as trial evidence. He, likewise, argues that none of the victims identified him in the lineup as one of the perpetrators.

The photograph lineup was not received as an exhibit and is not contained in the appellate record. However, the post-conviction court reviewed the lineup and determined that the Petitioner did not have any distinguishable marks or tattoos that would have made the shirtless photograph "constitutionally deficient." Trial counsel testified that he used the lineup to impeach the witnesses' credibility in an effort to establish that near the time of the offenses, Mr. Brown and Mr. Cartwright did not identify the Petitioner in the lineup as one of the perpetrators. Counsel said that nothing about the Petitioner's appearance in the photograph would have prevented the witnesses from identifying the Petitioner if the witnesses had seen the Petitioner during the offenses. Counsel did not recall the Petitioner's raising any concerns about the photograph.

The post-conviction court did not err by determining that trial counsel did not provide ineffective assistance. The court determined that the photograph was not unduly suggestive and that the witnesses' inability to identify the Petitioner went to the weight of the evidence, not to its admissibility. Counsel used the witnesses' inability to identify the Petitioner in the lineup to impeach their in-court identification of the Petitioner at the trial.

In essence, the witness's failure to identify the Petitioner in the lineup benefited his chosen theory that the Petitioner was not present during the incident. The record supports the court's determinations, and the Petitioner is not entitled to relief on this basis.

## C.  Motion for Severance

The Petitioner argues that trial counsel failed to file a motion for a severance. The Petitioner asserts that he should not have been tried jointly with his codefendant because the Petitioner's defense theory was misidentification, whereas his codefendant argued the incident was "a drug deal gone bad." The Petitioner argues that the codefendant's presence in the courtroom and defense theory were prejudicial to the Petitioner's case.

Trial counsel's credited testimony reflects that counsel and the codefendant's attorney worked together to prepare for the trial. Counsel acknowledged his defense theory that the Petitioner was not present during the incident and the codefendant's defense theory that the incident was a "drug deal gone bad" conflicted. Counsel said, though, that his "tactic" was that "two legal minds are better than one" and that working with the codefendant's attorney allowed counsel to have access to a joint defense investigator, who interviewed witnesses, and to the attorney's work product. Counsel considered the joint effort to be a "significant tactical benefit." Although counsel did not recall if the Petitioner had requested a severance, counsel determined that a severance would not have been appropriate because of his tactical decision to work extensively with the codefendant's attorney. Counsel determined that regardless of whether he sought a severance, the same evidence would have been "available" at the Petitioner's trial.

We conclude that the post-conviction court did not err by determining that trial counsel did not provide ineffective assistance. Counsel made a tactical and strategic decision to work with the codefendant's attorney in preparing for the trial. Furthermore, the Petitioner has presented no legal basis upon which counsel could have obtained a severance. We note that although this court concluded in the appeal from the conviction proceedings that *Bruton* was violated at the trial by the admission of the codefendant's statement implicating the Petitioner in the offenses, this court also concluded that the error was harmless beyond a reasonable doubt given the overwhelming evidence of the Petitioner's guilt, including the witnesses' in-court identifications of the Petitioner as one of the perpetrators. *Jack Price and Larry Thomas Cochran*, 2013 WL 5371679, at *13-15; *see Bruton v. United States,* 391 U.S. 123, 136-37 (1968) (concluding that when two defendants are tried jointly, the admission of a defendant's statement implicating a codefendant violates the codefendant's rights to confront and to cross-examine witnesses). Even if counsel had sought and obtained a severance, the same evidence would have been presented at the Petitioner's trial, save the admission of the codefendant's statement in which the Petitioner was implicated in the offenses. The record supports the court's determinations, and the Petitioner is not entitled to relief on this basis.

-17-

**D. Expert Testimony**

The Petitioner argues that trial counsel failed to request funds to hire a firearm expert to investigate why the handgun did not discharge during the incident but, rather, "made a 'click' noise and then the clip fell out to the ground." The Petitioner asserts that an expert could have testified that the "clip had not been securely inserted" and that this evidence would have shown a lack a premeditation to commit attempted first degree murder.

The post-conviction court did not err by determining that trial counsel did not provide ineffective assistance. The record reflects that the chosen defense theory was that the Petitioner was not present during the offenses and that the witnesses had misidentified the Petitioner. Based upon this theory, a munitions expert was unnecessary and irrelevant, rendering it inadmissible. *See* Tenn. R. Evid. 402 (irrelevant evidence inadmissible). Furthermore, the Petitioner did not present a munitions expert at the evidentiary hearing. *See Black v. State*, 794 S.W.2d 752 (Tenn. Crim. App. 1990). This court will not speculate about the potential testimony of an expert witness, and without evidence of what an expert's testimony might have been, the Petitioner is unable to establish his ineffective assistance allegation. As a result, the record supports the court's determinations, and the Petitioner is not entitled to relief on this basis.

**E. .25-Caliber Handgun**

The Petitioner argues that trial counsel failed to file a motion to exclude the .25-caliber handgun from evidence. The Petitioner asserts that this handgun was "linked" to the codefendant because the trial evidence showed Ms. Davis hid the handgun at the codefendant's request, that the State already had recovered the 9-millimeter handgun, and that the confidential informant who told the police about the handguns' location was never identified, depriving the Petitioner of the opportunity to cross-examine the confidential informant.

The record reflects that a confidential informant, who was never identified, told the police that Ms. Davis had possession of the .25-caliber handgun. Ms. Davis testified at the trial that she held the firearm at the codefendant's instruction, that the codefendant told her that the codefendant "pulled the trigger and the clip fell out," and that the police recovered the firearm from inside her bedroom. Likewise, the trial evidence showed that no identifiable fingerprints were found on either firearm used during the offenses. As a result, admission of the .25-caliber firearm did not implicate the Petitioner in the offenses. Trial counsel's credited testimony reflects that because the firearm and Ms. Davis's testimony did not implicate the Petitioner in the offenses, counsel did not cross-examine Ms. Davis for fear that counsel would open the door to evidence inculpating the Petitioner. As a result, even if counsel had provided deficient performance, the Petitioner failed to establish any prejudice by the firearm's admission as evidence.

Furthermore, the Petitioner did not present proof at the evidentiary hearing supporting his claim that the firearm should have been suppressed based upon the confidential informant's telling the police where the firearm was located. In any event, Ms. Davis testified at the trial that she had possession of the firearm as reported by the confidential informant, and the Petitioner had the opportunity to cross-examine Ms. Davis at the trial. The post-conviction court did not err by determining trial counsel did not provide ineffective assistance by failing to seek to suppress the firearm. The record supports the court's determinations, and the Petitioner is not entitled to relief on this basis.

## III.    Due Process Violations

The Petitioner contends that his due process rights were violated during the trial. He argues that he was denied his right to a fair trial because the court bailiffs and officers "focused too closely on" the Petitioner during the trial, which gave "the appearance that [the Petitioner] was in custody or was guilty of the crimes charged." The Petitioner likewise argues that his "constitutional rights" were violated because the Petitioner wore the "same street clothes" each day of the two-day trial.

After reviewing the trial court record, the post-conviction court determined that the Petitioner's independent allegations of due process violations were without merit. However, the Petitioner has waived consideration of these issues by failing to raise them in the trial court proceedings and in the appeal from the conviction proceedings. *See* T.C.A. § 40-30-106(g)(1), (2) (2018). In the context of post-conviction relief,

> [a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless:
>
> (1) The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or
>
> (2) The failure to present the ground was the result of state action in violation of the federal or state constitution.

*Id*. The Petitioner's allegation that his due process rights were violated during the trial because of the conduct of court bailiffs or officers and because he wore the same clothes during the two-day trial were issues that could have been, but were not raised, during the trial court proceedings and in the appeal from the conviction proceedings. As a result, the Petitioner has waived consideration of his allegations. The Petitioner is not entitled to relief on this basis.

To the extent that the Petitioner likewise claims that trial counsel provided ineffective assistance by failing to raise these issues in the trial court proceedings, the record supports the post-conviction court's denial of relief. The court discredited the Petitioner's testimony regarding the court bailiffs or officers "hovering behind or over" the Petitioner when the jury was inside the courtroom. The court found that the bailiffs or officers only stood between the defense table and the jury when the jury left the courtroom. Likewise, the court determined that the Petitioner's wearing the same clothes during the two-day trial did not violate the Petitioner's due process rights because the trial court record did not reflect "any suggestion" that the Petitioner had been incarcerated during the trial. The record does not preponderate against the court's determinations, and as a result, trial counsel could not have provided ineffective assistance by failing to raise these allegations during the trial court proceedings and on appeal. Therefore, the Petitioner is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE